ACREE, JUDGE:
Brandy Jadell Hamilton (mother) appeals from a Daviess Family Court ruling that her constitutional right to make decisions regarding her child, M.B.D. (child), must give way to the statutory right of Robert and Sharon Duvall (grandparents) to visit with mother's child. Because no special factors or circumstances exist to overcome the presumption that mother acted in child's best interests regarding the time child spent with grandparents, we reverse.
In May 2013, mother gave birth to child. The father was grandparents' son, Joshua *699 Edmond Duvall (father). Mother and father never married. Mother allowed father scheduled timesharing with child for a few hours, five days a week. Father lived with grandparents and child spent this time with all three. After father was incarcerated in January 2015, mother permitted child to continue visiting with grandparents on this schedule.
Father or grandparents or all three became dissatisfied with how visitation was going. On August 21, 2015, a verified petition for custody was filed naming father as the petitioner and mother as respondent. The averments are purportedly by father, but father did not sign the petition or the verification; it was verified only by grandparents.[1] (R. 1-5). Father was still incarcerated at the time. The petition sought joint custody with a designation of mother as child's residential parent. It also sought an award of parenting time to father but "that during the remainder of [father's] incarceration ... [grandparents] be allowed to exercise his [sic] some or all of his parenting time." (R. 2).
After father was released from jail, he moved the family court for an award of joint custody and parenting time. The motion was granted in May 2016 with limited weekend parenting time for father set during the next ninety days. After ninety days, father was to have parenting time consistent with the 2012 Daviess County Parenting Guidelines, Rules of the Daviess Circuit Court (RDCC), Appendix B (Guidelines). (R. 60-61).
On October 13, 2016, father was killed in a work accident. Mother attended father's visitation and funeral and took child with her, but she did not permit grandparents to take child with them that weekend. Going forward after father's death, mother continued to allow some visitation with grandparents but decreased visitation over time. Eventually, a routine developed. Mother allowed child to visit with grandparents overnight every other weekend from Saturday at 6 PM until Sunday at 6 PM.
Some six months after father's death, grandparents filed a motion to intervene in the action they had initiated on father's behalf nearly two years earlier.[2] Citing KRS[3] 405.021(3), their motion asserted it *700 was in child's best interest that grandparents "participate in the child's custody and upbringing." (R. 69). Grandparents asked that they "be awarded custodial time" with child and for the court "to make a determination that the biological father has in the past transferred his superior right to custody during his period of incarceration and ... to modify custody...." (R. 66-70).
The family court ruled that grandparents had standing to intervene but did not initially grant the "custodial time" sought. Instead, the family court entered an interlocutory order granting grandparent visitation each weekend for twenty-four hours, based on the court's understanding of what mother had voluntarily allowed. (R. 80).
On August 18, 2017, the family court held an evidentiary hearing. Grandparents, mother, and child's paternal aunt testified. The witnesses agreed that after the birth of child and before father's death, when mother returned to work, child spent substantial time with father and grandparents. Mother also agreed with the other witnesses that she allowed grandparents visitation while father was incarcerated, and she and grandparents took child to see father when he was on work release.
Grandparents testified that after father's death, mother began reducing the visitation she allowed with them and they feared she would eliminate all visitation. Mother also restricted grandparents from taking the child outside the state and, later, outside the county. This had the effect of preventing grandparents from taking child to see relatives, to attend their church, to visit father's grave, and to go to Disney World for fall break. Grandparents agreed that other than one occasion, mother consistently gave them twenty-four-hour visitation every other weekend and she permitted them some visitation on Christmas Day. Finally, grandparents testified they would be willing to pay child support.
Mother testified that she works in Evansville approximately fifty hours per week in ten-hour shifts, including a 12:30 PM to 10:30 PM shift on Wednesdays and has Mondays and Tuesdays off. She said child is four-years-old and has public preschool on weekday mornings. Her fiancé is a full-time student and takes care of child and his own child (who is child's three-year-old half-sibling) when mother is working. Her fiancé works on his online degree when the children are asleep. Mother testified that child considers her fiancé his father and she wants child to spend time with his future stepfather and sibling.
Mother restricted grandparents from taking child out of state because they took child to Evansville without informing her. Although she temporarily restricted them from taking child out of the county, she eliminated that restriction and did permit grandparents to take child out of state if they first obtained mother's permission. She explained that she opposed the proposed Disney World trip partly because of the timing. The trip would have coincided with the one-year anniversary of father's death and mother explained that grandmother continued to cry and be very emotional every time they exchanged child. She worried how grandparents' sorrow and mourning would impact child under those circumstances. She said she believed as child's mother she should be able to raise child as she sees fit. She believed she had allowed grandparents adequate visitation with child and that any additional time with child should be at her reasonable discretion. She also testified that her own mother only sees child once a month.
The family court made findings from the bench. Notably, the court rejected grandparents' claim to custodial rights based on their allegation that father transferred his *701 rights to them while he was incarcerated. The parties agreed that child's entitlement to father's social security benefits could effectively offset any requirement for child support payments owed by father or his estate, but no ruling was made on the child support issue.[4]
In its written order, the family court found child has a strong relationship with grandparents, that grandparent visitation would not be detrimental to mother's relationship with child due to her work schedule because she would largely be working while grandparents exercised visitation, and that grandparent visitation would result in only a slight loss of time to child with his mother, half-sibling, and future stepfather. The family court found child would benefit from a relationship with grandparents and his extended paternal family and, although grandparents are still emotional about the death of their son, child would not be harmed by spending time with them. Due to child's youth, his wishes were not sought.
The family court began applying the law to these facts with a conclusion that mother was a fit parent. Then, turning to its opinion of the best interests of the child, the court held that grandparents met their burden to rebut the presumption that mother's limitation of the time child spent with them was appropriate. It found child's best interest would be served by awarding non-custodial visitation to grandparents pursuant to the Guidelines with the alteration that midweek overnight visitation be held on Wednesdays when mother works later in the day. The family court's order permitted the grandparents to take child out of state but required them to inform mother ahead of time.
Mother does not dispute the family court's factual findings. She argues the family court erred in overruling her parental decision to limit the time child spends with grandparents to every other weekend. Mother argues the family court erred by essentially making grandparents co-parents with an award of visitation pursuant to the Guidelines without first finding that child was harmed by refusing more visitation or that the visitation allowed by mother was unreasonable. For reasons predominantly in accord with her argument, we agree with mother.
We are primarily guided in our review of the family court's order by Troxel v. Granville , 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and Walker v. Blair , 382 S.W.3d 862 (Ky. 2012). But before addressing how dissonant from these cases is the family court's order, the full meaning and impact of that order must be understood.
It is telling that grandparents initiated this case and sought visitation through father while he was in jail "claim[ing] that father transferred his superior right of custody to them during his incarceration[.]" This right, of course, is not transferable. And yet, that is precisely the effect of the order.[5] Its application will separate mother and child for more than 150 days every year in favor of the grandparents' exclusive visitation with *702 the child, based on the following schedule:
• two days every other weekend or three if the following Monday is a holiday (Martin Luther King Jr. Day, President's Day, Memorial Day, Labor Day, etc.);
• from 6:00 p.m. every Wednesday (modified from Tuesday) until 8:00 a.m. Thursday;
• two of the following holidays every year: New Year's Day; Easter; July 4th; Halloween;
• every Thanksgiving break from the time school lets out until 3:00 p.m. on Thanksgiving Day (in even-numbered years) and from 3:00 p.m. until the end of the break (every odd-numbered year);
• every Christmas break from the time school lets out until 12:00 noon on Christmas Day (in odd-numbered years) and from 3:00 p.m. until the end of the break (in even-numbered year);
• each of the child's birthdays from 8:00 a.m. until 6:00 p.m., unless it is a school day in which case it shall be 5:00 p.m. until 8:00 p.m.;
• every Fall break will be divided between mother and grandparents relatively equally with the exchange of the child occurring at 6:00 p.m. on the Friday following the last day of school preceding the break;
• every Spring break will be divided between mother and grandparents relatively equally with the exchange of the child occurring at 6:00 p.m. on the Friday following the last day of school preceding the break;
• during the Summer, the grandparents will have exclusive custody of the child for two (2) periods of two (2) consecutive weeks.
RDCC, App. B. Consider what holidays will be like. There will be mid-day exchanges on Thanksgiving and Christmas, and on the child's birthday. Fall and Spring breaks will be split in two. And, during the summer, the separation of mother and child will twice last two weeks at a time.
The family court's application of a schedule that was designed to balance the equal fundamental constitutional rights of two parents , impermissibly elevates the grandparents to that same superior station. Walker , 382 S.W.3d at 872 (A ruling that "would put fit grandparents on equal footing as fit parents ... violates the Due Process Clause."). It invites the same visitation disputes that, sadly, our courts have come to expect between parents.
Furthermore, the family court's finding that mother "wouldn't be giving up much time with her son" (R. 127) is demonstrably refuted, as is shown above, by the visitation schedule allowed. We cannot affirm such a finding when mother would be giving up about five months with her son every year.
The family court's remaining findings, discussed below, do not justify judicial intervention in the mother's decision about the amount of time her son visits his grandparents. This conclusion is all the more obvious when viewed through the lens of Troxel and Walker .
"The constitutional presumption that a fit parent acts in the child's best interest is the starting point for a trial court's analysis under KRS 405.021(1)." Walker , 382 S.W.3d at 870-71. Or as the Supreme Court of the United States put it: "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of *703 that parent to make the best decisions concerning the rearing of that parent's children." Troxel , 530 U.S. at 68-69, 120 S.Ct. at 2061. This admonition is not limited to the question whether to allow grandparent visitation; it applies to every and all "decisions concerning the rearing of that parent's children." Id. at 69, 120 S. Ct. at 2061. That includes how much visitation to allow third-parties, including grandparents.
The family court fails to recognize the remarkable factual similarity of this case and Troxel . Special note should be taken that Troxel was not about whether to allow visitation; it was about the precise issue presented to the Daviess Family Court - the appropriate amount of visitation and who should determine it.
In both cases , the paternal grandparents visited regularly with their respective grandchildren while their sons were alive. In both cases , "[a]lthough the [grandparents] at first continued to see [grandchildren] on a regular basis after their son's death, [mother] informed the [grandparents] that she wished to limit their visitation with her [children] to one short visit per[iodically]." Id. at 60-61, 120 S.Ct. at 2057. The Supreme Court's analysis in Troxel applied to these facts. It applies, as well, to the nearly identical facts of the case before us.
As did mother in this case, the mother (Granville) in Troxel acknowledged the grandparents' role in her children's lives. Her attorney made this opening statement to the trial court: "Right off the bat we'd like to say that our position is that grandparent visitation is in the best interest of the children. It is a matter of how much and how it is going to be structured[.]" Id. at 71, 120 S.Ct. at 2063 (opening statement by Granville's attorney; internal quotation marks omitted). The Daviess Family Court indicates that a similar acknowledgment in the instant case means that the court gets to determine how much visitation is in the child's best interest. But the Supreme Court of the United States indicated quite the opposite when it noted, disapprovingly, that the trial court "gave no weight to [the mother]'s having assented to visitation even before the filing of any visitation petition or subsequent court intervention." Id.
We see that just as these grandparents turned to a statute to secure more visitation, "the Troxels filed their petition under [a] Washington statute[ and] requested two weekends of overnight visitation per month and two weeks of visitation each summer. Granville [mother] did not oppose visitation altogether, but instead asked the court to order one day of visitation per month with no overnight stay." Id. at 61, 120 S.Ct. at 2058. Although the Washington statute at issue in Troxel was broader than that of Kentucky, the constitutional objection to both was that they "allowed grandparents to obtain visitation if the court found that visitation was in the best interest of the child, without the need for giving deference to the decision of the parent(s) to limit access." Jeff Atkinson, Shifts in the Law Regarding the Rights of Third Parties to Seek Visitation and Custody of Children , 47 Fam. L.Q. 1, 4 (2013).
The fate of the Washington statute was that the Supreme Court declared it unconstitutional as applied without the need to hold, generally, that "nonparental visitation statutes violate the Due Process Clause as a per se matter." Troxel , 530 U.S. at 73, 120 S.Ct. at 2064. Enlightened by Troxel , Kentucky courts, too, did not need to find our own grandparent visitation statute unconstitutional; rather, our Supreme Court simply required that "we must interpret the statute to comply with the federal constitutional standards set forth in Troxel. "
*704 Walker , 382 S.W.3d at 870. Properly understood, Troxel limits the power of the state, through its courts, to permit statutory grandparent visitation against the wishes of a fit parent exercising her constitutional right to determine the best interests of her own child.
We must and do continue to recognize, as Troxel did, that granting "statutory rights in this area to persons other than a child's parents ... comes with an obvious cost [because] an independent third-party interest in a child can place a substantial burden on the traditional parent-child relationship." Troxel , 530 U.S. at 64, 120 S.Ct. at 2059. Avoiding that cost is the responsibility of the courts. We must keep in mind that every period of visitation awarded to a third party, even a grandparent, puts a literal and emotional distance between parent and child.
It does not matter whether a state's usurpation of a fit parent's fundamental constitutional right to determine how much visitation to allow third parties derives from a statute, as in Troxel , or by a judge's order. Both violate the principle the Supreme Court of the United States recognized. When it comes to the amount of visitation allowed to these grandparents, the family court's ruling, like the Washington statute:
places the best-interest determination [regarding the amount of visitation] solely in the hands of the judge. Should the judge disagree with the parent's estimation of the child's best interests [regarding the amount of visitation], the judge's view necessarily prevails. Thus, in practical effect, ... [once a parent allows any visitation at all,] a court can disregard and overturn any decision by a fit custodial parent concerning [the amount of] visitation ..., based solely on the judge's determination of the child's best interests.
Id. at 67, 120 S. Ct. at 2061 (emphasis in original). Troxel prohibits this. Id. If we affirmed the family court's approach, we would be creating a rule that, once a parent agrees to any visitation, the family judge's best interest analysis supersedes the fit parent's best interest decision regarding the amount of visitation. Troxel rejects this very idea. That it should also be rejected here is most effectively demonstrated by comparing the trial court's basis for granting visitation in Troxel with the family court's basis in this case.
Not surprisingly, in both cases the grandparents were found to "have a strong relationship with" the child. (R. 127); see Troxel , 530 U.S. at 60-61, 120 S.Ct. at 2057. However, the Supreme Court rejected the argument that "clear and convincing proof of a loving relationship alone is not enough to overcome the parental presumption." Walker , 382 S.W.2d at 872.
The family court in this case also found "nothing that would make the court believe that the child would be harmed by spending time with his paternal grandparents." (R. 127). The Supreme Court in Troxel rejected a similar finding, stating:
The judge's comments suggest that he presumed the grandparents' request should be granted unless the children would be "impact[ed] adversely." In effect, the judge placed on Granville, the fit custodial parent, the burden of disproving that visitation would be in the best interest of her daughters.
Troxel , 530 U.S. at 69, 120 S.Ct. at 2062 (emphasis in original).
Next, the family court here found "that the child would benefit from a relationship with his paternal grandparents and his father's side of the family by extension to his father" and indicated a balance was necessary between "the family she [mother] is working to build [and] the relationship that the child has with father's family."
*705 (R. 127). In Troxel , the trial court made this similar finding: "the Troxels 'are part of a large, central, loving family, all located in this area, and the [Troxels] can provide opportunities for the children ... [who] would be benefitted from spending quality time with the [Troxels], provided that that time is balanced with time with the childrens' [sic] nuclear family.' " Troxel , 530 U.S. at 72, 120 S.Ct. at 2063. The Supreme Court admonished the lower court, saying:
These slender findings, in combination with the court's announced presumption in favor of grandparent visitation and its failure to accord significant weight to [the mother]'s already having offered meaningful visitation to the [grandparents], show that this case involves nothing more than a simple disagreement between the [trial court] and [mother] concerning her children's best interests.
Id. ; see also Walker , 382 S.W.3d at 870 ("[G]eneralized benefits that arise from a relationship between a grandparent and grandchild no longer have any role in determining grandparent visitation rights."). This record shows us the same - a simple disagreement between the Daviess Family Court and mother concerning this child's best interest.
As the Supreme Court said about the trial court in Troxel , the Daviess Family Court's order "was not founded on any special factors that might justify the State's interference with [the mother's] fundamental right to make decisions concerning the rearing of her [child]. To be sure, this case involves a visitation petition filed by grandparents soon after the death of their son-the father of [mother's child]...." Troxel , 530 U.S. at 68, 120 S.Ct. at 2061. The absence of those special factors leads to the next question - was the family court swayed by the grandparents' emotional need for visitation with the child of their recently deceased son? This question is justified given a specific finding of the family court about the grandparents' emotional state.
The family court found "the death of the Petitioner/father is still very raw with [grandparents] and they are still hurting a lot...." (R. 127). We do not doubt the verity of this finding. No doubt the child brings comfort to grandparents. But it is improper for a court to subordinate a fit mother's constitutional right to make decisions about her child just to offer succor to the grieving parents of that child's deceased father.
Finally, notice should be taken that the grandparents here sought visitation pursuant to KRS 405.021(3).[6] "A grandparent whose child is deceased may seek visitation under subsection (3) of the grandparent visitation statute" but there is a prerequisite that "the grandparent has assumed the financial obligation of child support owed by the deceased parent...." Walker , 382 S.W.3d at 874 (emphasis added). As did grandparents, the family court made reference only to KRS 405.021(3). The court failed, however, to make the required finding that grandparents met the criterion of assuming the financial obligation of child support. There is no order imposing upon the grandparents the child support obligation of their son, and there was no consideration whether, because of the son's death, that obligation should "be modified, revoked, or commuted to a lump-sum payment, to the extent just and appropriate in the circumstances." KRS 403.213(3). There is no finding that the Social Security benefits the child receives fails to fully satisfy the child support obligation.
*706 See Board v. Board , 690 S.W.2d 380, 381 (Ky. 1985) ("government benefits in the form of social security for child support may be credited against the parent's liability under the decree or agreement of settlement"). In fact, the idea that those benefits would be adequate was expressed at trial. If there had not been sufficient substantive reasons for reversing the family court's ruling, we would have been compelled to reverse and remand for further findings under that statute.
What we have in this case, at most, is "clear and convincing proof of a loving relationship" between the grandparents and the child. Walker , 382 S.W.2d at 872. Our Supreme Court considered whether such proof "alone is enough to overcome the parental presumption" and concluded that "[e]xcept in special circumstances, it is not enough." Id.
Absent those special circumstances, or "special factors" as referenced by the Supreme Court in Troxel , and neither are present here, our case boils down to this: "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." Troxel , 530 U.S. at 72-73, 120 S.Ct. at 2064 ; see Walker , 382 S.W.3d at 873 ("a trial court may not override parents' constitutional liberty interest in rearing their child simply because the judge believes that a better decision could be made").
No matter how well-intended, a grandparent's petition for visitation beyond a parent's consent is an attack upon that parent's superior and fundamental right to make her own determination of her child's best interest. The record in this case is devoid of the quality or quantum of evidence necessary to overcome the constitutional presumption that Brandy Hamilton, a fit parent, has acted in her child's best interest. Nor is there such evidence that would justify the Commonwealth, through its courts, to interfere with the decisions mother has made regarding grandparent visitation.
These decisions regarding visitation made by mother must be honored by the family court and the grandparents. For the foregoing reasons, the Daviess Family Court's November 8, 2017 order of grandparent visitation is reversed.
ALL CONCUR.

On its face, this is improper. The phrase "Comes now, the Petitioner, Joshua Edmond Duvall" is a legal idiom universally understood to state a fact - the identity of the person filing the petition. When grandparents signed the verification, they swore an oath to a falsehood; father did not file the petition, they did. There is nothing indicating father knew a petition was filed in his name and no lawful way for grandparents to do so. The same can be said regarding the contemporaneously filed verified motion for custody and visitation, which grandparents also filed and verified. The motion "requests that [grandparents] exercise [father's] court ordered visitation." (R. 6). If granted, the motion's effect would have been to avoid compliance with the grandparent visitation statute, KRS 405.021. Arguably, that was the intent. Mother objected to this procedure as "fail[ing] to comply with the statutory requirements for a verified petition" and moved to deny the petition on that ground. (R. 15-16). On November 6, 2015, before the family court took notice and while father was still incarcerated, father filed an amended motion (R. 20) and an amended petition (R. 22), both of which he personally verified. This approach to family law practice should not be condoned or encouraged. We decline to allow these questionable proceedings to prevent our review of the merits of this case.

We do not address the procedural or jurisdictional propriety of the grandparents' intervention in an action six months after the death of the petitioner except to say grandparents would have been entitled to bring a separate action for visitation under KRS 405.021. Granting intervention was an efficient use of judicial resources but not the best practice.

Kentucky Revised Statutes.

"If a parent obligated to pay support dies, the amount of support may be modified, revoked, or commuted to a lump-sum payment, to the extent just and appropriate in the circumstances." KRS 403.213(3).

The family court ordered visitation in accordance with the 2012 Daviess County Parenting Guidelines, Rules of the Daviess Circuit Court (RDCC), App. B. This appendix establishes the standard schedule for parents and it will entitle the paternal grandparents in this case to the same visitation their son would have been allowed, absent extraordinary circumstances, were he still alive.

"Pursuant to KRS 405.021(3), the [grandparents] then filed a Motion to Intervene and a Petition for Custodial Time." (Appellees' brief, p. 5).